Paul S. Knight, Plaintiff-Appellee, v. Q. B. Mitchell, Defendant-Appellant, and Fred C. Newman, Trustee, Account Q. B. Mitchell, Old National Bank, Ashland Oil & Refining Company, Defendants.

Gen. No. 67–81.

Fifth District.

May 20, 1968.

Craig & Craig, of Mt. Vernon (A. Ben Mitchell, of counsel), for appellant.

178

Gosnell & Benecki, of Lawrenceville (Maurice E. Gosnell, of counsel), for appellee.

MORAN, J.

This action was brought by Paul S. Knight, as coowner and operator of a certain oil and gas leasehold, against Q. B. Mitchell, as a coowner of this leasehold, to recover a pro rata share of certain costs expended for the operation and development of the oil wells located thereon. The defendant appeals from a decree entered allowing recovery for amounts expended for development of the leasehold, contending such expenditures were unauthorized, did not enhance the value of the lease, and were not necessary to preserve the leasehold. The defendant further appeals from the allowance of pro rata recovery for certain operating expenses which resulted from the unauthorized development procedure on the lease. The case was tried without a jury and there is no question raised on the pleadings.

The parties to this suit each owned a fractional interest in an oil and gas lease, comprising a sixty-three-acre tract referred to as the Mobley lease. Knight, who was the operator of the lease, held an $\%_{48}$ interest while Mitchell controlled a $15\!/_{48}$ interest. Three other persons controlled the remaining shares. This lease arrangement began in 1955 and although the parties never entered into a written operator's agreement, Mitchell testified that he agreed that Knight could operate the lease so long as it was operated satisfactorily. Knight recalled that the agreement was merely that he was to operate the lease.

Five wells were drilled on this property. In accordance with the oral agreement, Knight operated the lease and sent monthly statements to the various coowners based upon a pro rata sharing of the operating expenses. By July, 1965, the yield from the lease was minimal. Knight then engaged the services of a petroleum engineer to consider the possibility of attempting to produce from

179

the Tar Springs formation in the No. 4 well by a method called "fracking." The engineer's opinion was that although there was a definite possibility that the process would result in a yield of water rather than oil, that such a risk was justifiable. He estimated that this "frack" would cost approximately $3,000 and under no circumstances should it cost more than $6,000.

On November 1, 1965, Knight sent Mitchell a copy of the engineer's recommendation and asked if Mitchell would approve of the procedure. Mitchell did not approve and Knight, after receiving the approval of the other owners, had the No. 4 well fracked. The procedure proved unsuccessful and at the time of the trial the well was yielding water. The total cost of this procedure was $2,952.69.

Prior to the unsuccessful venture, natural gas was used to operate the engines which pumped the wells. In cold weather there frequently would not be enough natural gas to operate the pumps. Under such circumstances, Knight would wait until it warmed up each morning when the gas would come up in sufficient quantities to run the pumps. At the time of the unsuccessful venture, the natural gas supply became insufficient and thus required the purchase of butane gas.

Mitchell refused to pay his pro rata share ($922.72) of the frack and of the butane charges ($139.45) on the ground that he, as a coowner, did not agree to the expenditure for the fracking and that this unsuccessful process caused the termination of the natural gas production.

The court entered a judgment for Knight in the amount of $2,638.01 as Mitchell's proportionate share of operating expenses and awarded a lien against Mitchell's interest in this amount. This appeal is limited to the amount for fracking ($922.72) and the butane charge ($139.45).

The appellant contends that a cotenant who expends funds for development without the consent of his co-

180

tenants cannot demand contribution from the coowners except from the profits realized from that specific venture. It is undisputed that Knight proceeded without Mitchell's consent and therefore, the appellant concludes, the expense should be borne by Knight. The appellant agrees that under the arrangement he was liable for his share of the ordinary operating expenses, but contends that the unsuccessful development charges and the butane expenses resulting therefrom are not ordinary operating expenses.

The appellee contends that the relationship between the parties was not that of cotenancy, but rather that a mining partnership existed and that under such a relationship the partnership property is subject to a lien in favor of the operating partner for his share of the costs, that the majority holders of the mining partnership have the power to control the management of the partnership and that all of the partners, Mitchell excepted, agreed to the fracking.

The term "mining partnership" made its first appearance in this action in appellee's brief. There was no mention of a mining partnership in the complaint nor at any time during the trial. Appellee contends that the trial court did in fact find a mining partnership existed, although the precise term was not used. The theory upon which a case is tried in the lower court cannot be changed on review. An issue not presented to or considered by the trial court cannot be raised for the first time on review. Woman's Athletic Club of Chicago v. Hulman, 31 Ill2d 449, 202 NE2d 528. Accordingly, we will not consider the contention that a mining partnership existed.

Knight further contends that even if no mining partnership existed, that a coowner is nevertheless liable for a proportionate share of development expenses to which he did not consent. This proportionate share would be realized from Mitchell's share of profits derived from

181

the lease. Appellee points out that if the lease is to continue and oil is derived from No. 4, Mitchell should not be allowed to retain his interest in this well and yet not pay his share of expenses involved in attempting to produce it.

In Young v. McKittrick, 267 Ill App 267, the plaintiff sought a judgment against a cotenant for a proportionate share of the cost of drilling a well without consent of the cotenant. The court held:

> "A cotenant, who develops a mine without the consent of his cotenants, cannot demand from such cotenants contribution or remuneration for expenses incurred in prospecting or developing the common property. He must get contribution, if at all, from the profits realized from the property. . . . While a cotenant of a mining claim, who without the consent of his cotenants, incurs expense in prospecting, cannot demand contribution from them, yet he may, when called upon to account for profits, set off the costs of the improvements which were necessary and enhanced the value of the common property." Id. at 269.

However, there is no showing that the fracking improved or enhanced the value of the property. In fact, it was admitted that no significant quantity of oil has been pumped from the Number 4 well since the fracking. The Young case does not say that the party can be reimbursed from profits realized from other unrelated wells on the same lease property. Therefore, Knight should not be reimbursed from the profits derived from the other wells.

We believe that there was sufficient evidence to support a conclusion that the insufficient quantity of natural gas was caused by conditions other than the fracking and therefore this expenditure was a necessary operating expense to be shared proportionately by Mitchell.

Accordingly, we reverse the judgment relating to the cost of the fracking ($922.72) and affirm the lien for the cost of the butane ($139.45).

Affirmed in part, and reversed in part.

EBERSPACHER and GOLDENHERSH, JJ., concur.